**UNITED STATES of America,**
**Appellee,**

**v.**

**William KINNEY and Kevin Kelly, also known as John Moore, also known as Jack Murphy, Defendants–Appellants.**

**Docket Nos. 99–1345, –1501**

United States Court of Appeals,
Second Circuit.

Argued: Feb. 3, 2000

Decided: April 28, 2000

Jonathan I. Edelstein, New York, N.Y. (Abraham Abramovsky, of counsel), for Defendant–Appellant Kinney.

Gary Schoer, Syosset, NY, for Defendant–Appellant Kelly.

James Tatum, Jr., Assistant United States Attorney, Brooklyn, N.Y. (Loretta E. Lynch, United States Attorney, David C. James and Jo Ann Navickas, Assistant United States Attorneys, of counsel), for Appellee.

Before OAKES, CABRANES and SACK, Circuit Judges.

OAKES, Senior Circuit Judge:

William Kinney and Kevin Kelly ("defendants") were convicted of conspiracy and mail fraud based on their involvement with a fundraising effort for a law enforcement charity. The United States District Court for the Eastern District of New York, Arthur D. Spatt, *Judge,* entered the convictions pursuant to a jury verdict and imposed sentences of incarceration. Defendants appeal their convictions primarily on the ground that there was insufficient evidence to support the jury's verdict. Additionally, defendants appeal their sentences on several fronts. Because we find that defendants' convictions were adequately supported by the evidence and their sentences were properly calculated, we affirm.

## BACKGROUND

Defendants worked for a company called American Interconnect Agency ("AIA"), a business which contracted with various charitable organizations to solicit funds on their behalf. Kinney was the vice president and founder of AIA, and Kelly was the office manager. In the fall of 1992, AIA contracted to raise funds for the Drug Enforcement Agency of New York ("DEANY"), a non-profit organization not connected to the federal Drug Enforcement Administration whose primary purpose was to educate police officers. The one-year contract provided that AIA would solicit potential contributors to DEANY within the state of New York and sell them advertising space in two journals that would be produced by AIA during the contract term and distributed widely to DEANY's 1200 members and all its contributors. Of the money raised by AIA, the first $40,000 was guaranteed to DEANY and AIA was to keep what remained after paying the costs of solicitation and journal production.

The contract was negotiated by Kinney and John Belizzi, the executive director of DEANY. During these negotiations, Belizzi specified that AIA could not make misrepresentations in its solicitations as to the purpose of the contributions or the identity of the solicitors. In particular, Belizzi emphasized to Kinney that AIA salespeople should not hold themselves out as police officers or as connected with the Drug Enforcement Administration of the United States Department of Justice. Belizzi also told Kinney that the salespeople should not tell potential contributors that funds raised would be used to educate children or to put more police officers on the street. Belizzi did not state to Kinney that the funds would be used to buy bulletproof vests or to supplement a death fund for police officers slain in the line of duty.

DEANY received the $40,000 guaranteed under the contract in May 1993. By the end of the contract year, however, AIA had not published either of the two journals as promised, although it had raised over $200,000—in addition to the $40,000 given to DEANY—through its advertising solicitations. In November 1993, AIA's records were seized by the U.S. Postal Inspection Services and arrest warrants were issued for defendants, charging them with mail fraud. Defendants were ultimately indicted for mail fraud and conspiracy based on their alleged misrepresentations that (1) they would produce the

journals; and (2) that contributors' money would go to drug education programs and death benefits for families of slain police officers.

At trial, the government presented testimony from people who had been solicited by AIA and contributed money to DEANY in exchange for advertising space in the promised journals. These witnesses testified that the AIA salesmen had told them that their donations would go to drug education for children, that the salesmen identified themselves as law or drug enforcement officers, and that they were told that their advertising would appear in the next journal. Because AIA had not published a journal by November 1993 when its records were seized, none of these witnesses ever received the expected advertising. The government also introduced testimony from two AIA salesmen who said that they consistently made misrepresentations as to their identities and as to how the solicited funds would be used, and that they did so based on "pitch sheets" prepared by Kinney.

Additional testimony was presented from people involved in preparing to publish the journals. Kinney's secretary testified that she sorted advertising copy as it came in from contributors and put it in a box in Kinney's office, where it was found in the November 1993 seizure. A graphic designer testified that he communicated with Kinney about the journal, but never received any advertising or editorial copy from him.

Kinney testified on his own behalf that he had collected advertising and editorial copy for the DEANY journal and taken steps to have the journal published. He claimed that he had sent editorial copy to the graphic designer, but mistakenly used the wrong address so that it never was received. Kinney also testified that he instructed his salesmen not to represent themselves as police officers or tell contributors that their money would go to drug education. Kelly did not testify.

After the jury returned a guilty verdict on all counts in October 1998, the district court held hearings on sentencing. Based on the hearings, the district court calculated defendants' sentences as follows: In addition to the base offense level, each defendant's offense level was increased for the amount of loss produced by the fraud, the fact that the scheme involved more than minimal planning and/or more than one victim, and the fact that defendants misrepresented that they were acting on behalf of a charitable organization. The district court also enhanced Kinney's sentence on obstruction of justice grounds because he perjured himself at trial, and enhanced Kelly's sentence because of his role as a manager.

Kinney's and Kelly's convictions and sentences were entered by judgment on July 14, 1999 and June 10, 1999 respectively. This appeal followed.

## DISCUSSION

Defendants appeal the sufficiency of the evidence supporting their convictions for mail fraud, arguing that they did not make false or material misrepresentations and that they lacked the requisite fraudulent intent for the crime. Defendants also contest the propriety of their sentences on several fronts, the most significant being that it was erroneous to apply a two-level enhancement for misrepresenting that they were acting on behalf of a charitable organization. We will discuss each of these arguments in turn.

## I. Sufficiency of the Evidence

As we recently reiterated in *United States v. Salameh*, 152 F.3d 88, 151 (2d Cir.1998), a defendant challenging the sufficiency of the evidence leading to his conviction "bears a heavy burden." *Id.* (quoting *United States v. Masotto*, 73 F.3d 1233, 1241 (2d Cir.1996)). We must sustain the conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In analyzing the evidence, we "credit[ ] all inferences and credibility assessments that the jury might have drawn in favor of the government and view[ ] the evidence as a whole rather than piecemeal." *United States v. Aulicino,* 44 F.3d 1102, 1114 (2d Cir.1995) (internal citations omitted). As the Supreme Court stated in *Jackson,* this approach "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." 443 U.S. at 319, 99 S.Ct. 2781.

■ The crime of mail fraud, which served as the basis for defendants' conviction, has three elements: "(1) use of the mails to further (2) a scheme to defraud with (3) money or property as the object of the scheme." *United States v. Gole,* 158 F.3d 166, 167 (2d Cir.1998). It is the second element that defendants contend was not supported by sufficient evidence in this case—namely, that the misrepresentations alleged in the indictment amounted to a scheme to defraud. Defendants claim that the government did not prove that the alleged misrepresentations were false, material, or demonstrated the requisite intent to defraud required under *United States v. Dinome,* 86 F.3d 277, 283 (2d Cir.1996) ("fraudulent intent is essential to a scheme to defraud." (internal quotation omitted)).

■ We find no merit in defendants' contentions. At the heart of the government's case was the charge that defendants misrepresented the fact that AIA would print contributors' advertising in two journals. Defendants do not argue that this misrepresentation was not material, but rather that the government failed to prove that they did not intend to publish the journals. To support their argument, they cite the case of *United States v. D'Amato,* 39 F.3d 1249, 1261 n. 8 (2d Cir. 1994), for the proposition that fraudulent intent cannot be inferred from mere non-performance of a contractual obligation. Defendants claim that, based on *D'Amato,* the government did not prove that at the time defendants solicited advertising from contributors, they did not intend to publish the journal.

We cannot agree with defendants' argument. Unlike the case at bar, *D'Amato* turned on the allegation that the defendant had not performed services provided for in a contract between him and Unisys, the party he was accused of defrauding. *See id.* at 1261. Here, the misrepresentations at issue were made not to DEANY, the other party to the AIA contract, but rather to the individual contributors solicited by defendants. More importantly, the evidence in *D'Amato* demonstrated that Unisys never expected the defendant to provide the services at issue and therefore no criminal intent could be established from his failure to do so. *Id.* ("There is ... no dispute that D'Amato performed all the services for Unisys that were requested of him."). In this case, even if the contributors to DEANY could be said to have entered into a contract with AIA, they clearly expected to get their advertisements published in a journal and never did. Thus *D'Amato* 's holding, which is based on the distinction between breach of contract and fraud, is of negligible assistance to defendants.

The government offered the following evidence of defendants' criminal intent to defraud DEANY's contributors by not publishing the journals: (1) the fact that the advertising copy received from contributors was found in Kinney's office at least five months after the last promised date of publication; (2) testimony by Bellizzi that he repeatedly inquired about the status of publication but never saw any efforts toward publication; (3) testimony by the graphic artist that he did not receive any copy for the journal and reminded Kinney in May and June 1993 that none had been provided; (4) testimony by a contributor that Kelly told him that the journal would be published monthly; (5) testimony by

AIA salesmen that Kelly knew that no journal would ever be published; and (6) Kinney's post-arrest misrepresentation that there was an escrow account to cover the cost of publication. Assessing this evidence in the light most favorable to the government, as we must, we find it was sufficient to establish that defendants acted with the requisite criminal fraudulent intent.

 Indeed, defendants offer very little to challenge such a finding. The only credible evidence offered that raises a competing inference regarding intent is Kinney's assertion that journal copy was mis-delivered in June 1993, necessitating a trip to Albany for additional copy. This "fact," however, comes from Kinney's own testimony and therefore goes only to the weight of the evidence, not its sufficiency. *See United States v. Ramirez,* 79 F.3d 298, 306 (2d Cir.1996). "The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal." *Id.; see also United States v. Miller,* 116 F.3d 641, 676 (2d Cir.1997). In analyzing a sufficiency of the evidence claim, "[w]e defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998) (citation omitted). Here, the jury was entitled to disbelieve Kinney's self-serving testimony and find that defendants possessed the necessary intent to defraud contributors with the misrepresentation that the journals would be published. With respect to the other misrepresentations alleged in the indictment—that AIA's salesmen claimed that contributions would go to drug education and to a death insurance fund—we see no reason to revisit the substantial evidence that these statements were indeed false, material, and used in furtherance of a fraudulent scheme. Defendants place heavy reliance on *United States v. Starr,* 816 F.2d 94 (2d Cir.1987), and *United States v. Regent Office Supply Co.,* 421 F.2d 1174 (2d Cir.1970), in arguing that because contributors to DEANY were not misled about the fact that they were donating to a charitable organization, and were misled only about the uses of the donated funds, they were not defrauded by defendants' misrepresentations. In *Starr* and *Regent,* we found that in order to establish mail fraud, there must be some harm contemplated to the victim of the fraud that goes to the nature of the bargain itself. *See Starr,* 816 F.2d at 99 (finding no fraud because "there was no discrepancy between benefits reasonably anticipated and actual benefits received" (internal quotation omitted)); *Regent,* 421 F.2d at 1182 (no fraud when misrepresentations did not "affect[ ] the customer's understanding of the bargain nor . . . influenc[e] his assessment of the value of the bargain to him"). If defendants "in no way misrepresented to their customers the nature or quality of the service they were providing," *Starr,* 816 F.2d at 99, then statutory mail fraud cannot exist.

Here, the victims of defendants' fraud—the DEANY contributors—were given false information about *how* their money would be spent, and made a decision whether to donate money based on that information. We cannot agree with defendants that these misrepresentations did not affect the contributors' understanding of their bargain with DEANY and mislead them as to the nature and quality of DEANY's activities. In such circumstances, we have not hesitated to hold that *Starr* and *Regent* have no application. *See United States v. Walker,* 191 F.3d 326, 335–36 (2d Cir.1999) (finding mail fraud when lawyers exacted fees for false asylum applications submitted without regard for client's needs or intentions); *United States v. Frank,* 156 F.3d 332, 336 (2d Cir.1998) (*Starr* does not apply when customer "did not receive the service . . . for which they had contracted and paid"); *United States v. Paccione,* 949 F.2d 1183, 1197 (2d Cir. 1991) (reliance on *Starr* and *Regent* misplaced when "there [wa]s no question that . . . customers did not get what they paid

for"). Because defendants' dishonesty was not incidental to the contributors' decision to make donations to DEANY, but rather was aimed at influencing those decisions directly, an intent to defraud was established.

In sum, we find that defendants have not overcome their burden of demonstrating that their convictions were unsupported by sufficient evidence of fraudulent intent. We will therefore not disturb the judgment of the jury that defendants were guilty of mail fraud.

## II. Sentencing

■ Defendants challenge the district court's enhancement of their sentences pursuant to the United States Sentencing Guidelines ("U.S.S.G.") § 2F1.1(b)(4) (1998),[1] which allows a two-level enhancement where the offense involved "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization." *See id.* On appeal of a sentence, we apply a *de novo* standard of review to the court's legal determinations, giving due deference to the district court's application of the guideline provision to the facts. *See United States v. Echevarria,* 33 F.3d 175, 178 (2d Cir.1994).

The correct interpretation of U.S.S.G. § 2F1.1(b)(4) as applied to charitable solicitations has yet to be addressed by this Court. The district court adopted the reasoning of *United States v. Bennett,* 161 F.3d 171 (3d Cir.1998), to conclude that although defendants were authorized to solicit funds for DEANY, their misrepresentations as to the use of donated funds, the publications of the journals, and their identities were designed to enhance personal gain and thus came within the meaning of Section 2F1.1(b)(4). Defendants now urge us to reject *Bennett* as a minori-

ty approach and instead hold that a Section 2F1.1(b)(4) enhancement is warranted only when a defendant either acts on behalf of a bogus organization or misrepresents that he has authority to act on behalf of a legitimate organization.

A close reading of *Bennett* and the cases from other circuits addressing the application of Section 2F1.1(b)(4) convince us that the district court's approach was the right one. In *Bennett,* the defendant created a Ponzi scheme in which he induced people to buy into a charitable organization with the promise that their money would be doubled by an anonymous donor and be donated to the charity of their choice. 161 F.3d at 174. Bennett then relied on the donations of subsequent investors to pay out on original deposits and frequently dipped into the funds to benefit himself personally. *Id.* at 174–75. Following his fraud conviction and sentencing, Bennett appealed, arguing that Section 2F1.1(b)(4) did not apply because he was at all times acting on behalf of a legitimate charitable organization. *Id.* at 191. The court rejected this "narrow interpretation of the enhancement" and found that even though the charitable organization was legitimate:

> Bennett used his position there to ensnare donors with falsehoods designed to generate contributions. He exploited his victims' altruism to reap personal, pecuniary gain. We find no authority for the proposition that the enhancement applies only if the "charitable" organization is fraudulent from its inception and in every facet of its operations.... Regardless of their motivation to give money to [the organization], donors had a right to expect that their contributions would be used in the manner that Bennett had promised.

---

**1.** We note that throughout the briefs, all parties refer to the applicable Guideline provision as Section 2F1.1(b)(3). Although this was the correct citation prior to the 1998 Guidelines, amendments in 1998 put the ap-

plicable provision at U.S.S.G. § 2F1.1(b)(4). Because defendants were sentenced in 1999, the 1998 Guidelines apply. *See* U.S.S.G. § 1B1.11(a).

*Id.* at 191–92. The court then held that Section 2F1.1(b)(4) is properly applied in a case where the defendant is technically acting on behalf of a charity, but is doing so as a means of benefitting himself personally. *Id.* at 192.

Other circuits have reached equivalent conclusions. In *United States v. Aramony,* the court held that an enhancement under Section 2F1.1(b)(4) is appropriate "even if the defendant did not misrepresent his authority to act on behalf of a particular organization, but rather only misrepresented that he was conducting an activity wholly on behalf of such organization." 166 F.3d 655, 664 (4th Cir.1999). In that case, the CEO of the United Way of America (UWA), who diverted institutional funds for his personal use, was found to have "misrepresent[ed] that he was acting wholly on behalf of UWA in soliciting donations." *Id.; see also United States v. Marcum,* 16 F.3d 599, 603 (4th Cir.1994) (enhancement applies to sheriff who misrepresented that he was conducting bingo games solely to benefit a local sheriff's organization when he was actually pocketing 10% of the proceeds). Similarly, in *United States v. Lilly,* 37 F.3d 1222, 1228 (7th Cir.1994), the court found that a church pastor who encouraged his congregation to invest in church-sponsored certificates of deposit and then used the funds partially for his personal benefit had misrepresented that he was acting on behalf of a legitimate organization as contemplated by Section 2F1.1(b)(4).

Defendants cite two cases that they claim represent the "majority" view with respect to Section 2F1.1(b)(4)'s application. One, *United States v. Starr,* 986 F.2d 281 (8th Cir.1993), is readily distinguishable from this case. There, Starr's conviction for bank fraud was based on a bounced check, not on any misrepresentation that he was acting on behalf of a charity. *Id.* at 282. The fact that the check was from the account of a charitable organization was entirely incidental to Starr's conviction, and the court found that no increase under Section 2F1.1(b)(4) was justified.

Defendants are better served in their reliance on *United States v. Frazier,* 53 F.3d 1105 (10th Cir.1995), which involved a defendant who misused federal grant funds to purchase computers rather than to provide computer training. The court declined to follow the Fourth Circuit's holding in *Marcum,* limiting the application of Section 2F1.1(b)(4) to cases in which "the defendant exploits his victim by claiming to have authority which in fact does not exist" rather than "us[ing] funds to which [an] organization was entitled for unauthorized purposes." *Id.* at 1113. The court based its alternative holding on its conclusion that "the particular social harm which the Sentencing Commission perceived as justifying an enhanced sentence of one who falsely represents one's authority—the exploitation of victims' generosity and charitable motives—[wa]s completely lacking." *Id.* at 1114–15 (internal quotation omitted).

No other circuit has adopted the position set forth by the Tenth Circuit Court of Appeals in *Frazier. See Aramony,* 166 F.3d at 664 (affirming the reasoning and holding of *Marcum* ); *Bennett,* 161 F.3d at 192 (distinguishing *Frazier* on grounds that it did not involve active solicitation that exploited charitable impulses); *United States v. Ferrera,* 107 F.3d 537, 543 (7th Cir.1997) ("We have implicitly rejected *Frazier*'s reasoning limiting applicability of the Guideline to defendants who have no actual authority to act on behalf of the organization involved."). Moreover, the background commentary to the fraud guideline states that the "guideline is designed to apply to a wide variety of fraud cases. . . . Use of false pretenses involving charitable causes . . . enhances the sentences of defendants who take advantage of victims' trust in . . . law enforcement agencies or their generosity or charitable motives." U.S.S.G. § 2F1.1 cmt. (backg'd). We are convinced that *Bennett* represents the better interpretation of

Section 2F1.1(b)(4) and its accompanying comment, and therefore decline to follow *Frazier* to the extent that it is in disagreement with *Bennett.*

Applying the reasoning of *Bennett* to this case, the district court correctly concluded that defendants had employed misrepresentations about the use of donated funds and their own identities for personal enrichment. While we recognize that "boiler room" contracts such as the one entered into by DEANY and AIA are not illegal, defendants raised in excess of $200,000 for themselves by relying partially on unauthorized solicitation tactics. Despite having been specifically prohibited by the executive director of DEANY from holding themselves out as law enforcement officers and from representing that donated money would go to student drug education and an officers' death benefit fund, defendants used such misrepresentations, as well as the allure of widespread distribution of the promised journals, to induce people to contribute. Defendants' conduct fits comfortably into *Bennett*'s criteria of "ensnar[ing] donors with falsehoods designed to generate contributions .... [and] exploit[ing] ... victims' altruism to reap personal, pecuniary gain." 161 F.3d at 191. We therefore affirm the application of a two-level enhancement to their sentences under U.S.S.G. § 2F1.1(b)(4).

### III. Defendants' Other Arguments

Defendant Kelly claims his conviction was tainted because the district court erroneously admitted evidence of uncharged wrongful acts under Federal Rule of Evidence 404(b). Additionally, defendants challenge their sentences on a variety of other grounds, including the district court's amount of loss calculation, its finding that Kelly was a manager, and its finding that Kinney had obstructed justice by perjuring himself at trial. We have considered defendants' arguments on all these points and find them to be without merit.

### CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court in all respects.