**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

———————————————

Nos. 03–2296, 03–2383–2386, 04–1951, 04–2339, 04–2378

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROBERT D. PALADINO, *et al.*,

*Defendants-Appellants.*

———————————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 852—**William T. Hart**, *Judge.*

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RANDY VELLEFF,

*Defendant-Appellant.*

———————————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 398—**Joan Humphrey Lefkow**, *Judge.*

UNITED STATES OF AMERICA,

Nos. 03–2296, 03–2383–2386, 04–1951, 04–2339, 04–2378  2

*Plaintiff-Appellee*,

v.

JOHN PEYTON,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 CR 10054—**Joe Billy McDade**, *Judge*.

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

DARRELL TURNER,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:03–CR–22—**Robert L. Miller, Jr.**, *Chief Judge*.

———————————

Argued February 14, 2005—Decided February 25, 2005 *

———————————

Before POSNER, WOOD, and WILLIAMS, *Circuit Judges*.
POSNER, *Circuit Judge*. We have consolidated for decision
several criminal appeals, argued the same day, all of which

---

* This opinion is being released in typescript. A printed version will fol-
low.

present the key issue left open by the Supreme Court's decision in *Booker v. United States*, 125 S. Ct. 738 (2005)—the application of the plain-error doctrine to appeals from sentences rendered under the federal sentencing guidelines before the Supreme Court ruled that they are advisory rather than mandatory. Three of the cases present nonsentencing issues as well, and we begin with them.

Paladino and his codefendants were convicted by a jury of a variety of federal crimes arising out of a scheme to defraud investors that succeeded in fleecing $11 million from the victims. The scheme had two stages, but only the second, which lasted from 1995 to 1997, generates nonsentencing issues. Defendant Iles, whose function was to recruit the investors, to whom she promised absurd returns—more than 100 percent *per week* for at least 40 weeks—made a variety of false representations. The one most significant to her appeal is that she and James Wardell (who died before he could be indicted) were reputable and experienced investment advisors. In fact Iles had pleaded guilty to federal fraud charges in 1988 and the following year had been banned by the SEC from ever associating with members of the securities industry, while Wardell had been convicted in a state court of theft by fraud in 1975, and in 1972 had consented to an SEC order forbidding him to violate federal securities laws in the offer and sale of stock in a corporation in which he had been involved. The government was permitted to present all these prior "bad acts" to the jury, and also to argue that Iles knew about Wardell's conviction and SEC bar order, though all Wardell had told her, when she informed him of her own SEC bar order, was that he, too, had had problems with the SEC.

Rule 404(b) of the Federal Rules of Evidence forbids the use of evidence of a defendant's history of illegal or unethical acts to prove that he is a person of bad character and likely therefore to have committed the crime of which he is accused in the present case, or perhaps some other, undetected crime for which he should be punished. The government argues that it presented the evidence of Iles's and Wardell's bad acts

for the innocent reason that those acts were so "inextricably intertwined" with the conduct of which the defendants were accused in this case that the jury needed to know the bad acts in order to form a complete picture of that conduct. *United States v. Spaeni*, 60 F.3d 313, 316 (7th Cir. 1995); *United States v. Ramirez*, 45 F.3d 1096, 1102–03 (7th Cir. 1995). Such evidence can be proper to enable the jurors to make sense of the evidence pertaining to the criminal activity of which the defendant is currently accused, *United States v. Gibson*, 170 F.3d 673, 682 (7th Cir. 1999), and to avoid puzzling them by making them think that facts important to their understanding of the case are being concealed. But those were not problems here. If the jurors never heard anything about Iles's and Wardell's previous legal troubles, it would not have occurred to them that they were missing anything or have made any of the other evidence in the case unintelligible.

The government's fallback position is stronger—that Iles's failure to disclose Wardell's and her histories was a part of the scheme. But the government overreaches by arguing that anyone who solicits an investment is required, on pain of criminal liability for failing to do so, to disclose any previous conviction for fraud, or for that matter anything else that might give an investor cold feet. If asked by the investor about such things, the solicitor would have to give a truthful answer or be guilty of fraud. E.g., *United States v. Tadros*, 310 F.3d 999, 1006 (7th Cir. 2002); *United States v. Ross*, 77 F.3d 1525, 1543 (7th Cir. 1996); *United States v. Kinney*, 211 F.3d 13, 17–19 (2d Cir. 2000). But to fail to volunteer such information would be fraud only if potential investors would assume that someone soliciting an investment would disclose such a history. We doubt that that would be a reasonable assumption, and in any event the government has made no effort to argue that it would be or to provide cases that support its expansive notion of fraud.

It is true that a fiduciary (which Iles was, as we'll see when we come to the sentencing issues) is required to disclose facts material to his principal, e.g., *Carr v. CIGNA Se-*

*curities, Inc.*, 95 F.3d 544, 547–48 (7th Cir. 1996); *United States v. Szur*, 289 F.3d 200, 211–12 (2d Cir. 2002), and true too that materiality implies merely that disclosure would make a difference to the principal's decision, *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001), and that most principals if they learned that their fiduciary had been convicted of fraud would tell him to take a walk. But pushed to its logical extreme, this reasoning would have required Iles to preface every conversation with a customer with a detailed recitation of everything in her personal history that might alarm or discourage him, on pain of criminal punishment if she intentionally left something out. It would also make a person who had ever been convicted of fraud a leper in the investment business, even if she had not been barred from the industry.

We need not pursue this issue; for what is incontestable is that Iles's history is evidence that the representations she made to potential investors really were misleading. She had represented to them that she was both reputable and experienced, and by doing so had implied that she had a clean record, and certainly that she had not been barred from the securities business for life almost a decade earlier, after being convicted of criminal fraud. What made the representation misleading was precisely her history; that history was therefore direct evidence of guilt rather than evidence merely of bad character. *United States v. Polichemi*, 219 F.3d 698, 709–10 (7th Cir. 2000).

The judge should not, however, have permitted the evidence of Wardell's legal troubles to come in without evidence that Iles actually knew about them. All Wardell told her was that he had had problems with the SEC. Many members of the securities business have had problems with the SEC that did not result in their being barred from the business. The SEC does not bring remedial proceedings against everyone whom it investigates and it does not prevail in all the proceedings that it does bring. Anyone who had to defend him-

self against the agency would acknowledge having had problems with it even if he had been exonerated. The judge's error, however, was harmless, because the evidence against Iles, especially in light of our conclusion that her own previous fraud judgments were properly placed before the jury, was compelling.

Defendant Paladino complains that he was forced to take the stand by an erroneous evidentiary ruling. He had been deposed years earlier in an SEC proceeding, and in the criminal trial the judge allowed the government to present a severely cropped version of the deposition in an effort to demonstrate his guilty knowledge. Some of the deletions were required in order to protect the rights of the other defendants, see *Bruton v. United States*, 391 U.S. 123 (1968), but not all. An issue of great importance to Paladino's guilt or innocence was whether he knew that money in a certain account was money of investors ("invested money" or "investment money")—which as soon as it was received was checked out to him and the other defendants without ever being invested—or proceeds of legitimate transactions ("trade money"). Asked at the deposition about his knowledge of the invested money, he said: "I learned that this money that's been coming in was investment money, and I was totally surprised because I assumed this whole time that this was trade money." The government put a period after "investment money" and deleted the rest of Paladino's answer. The difference between "I learned" and "I was surprised to learn" is subtle but potentially important; if Paladino wasn't surprised to learn that investor money was being misapplied, this would suggest that he had previous knowledge of the fraud, which he denied.

There were other harmful deletions. For example, handed during his deposition a "secured investor program agreement," Paladino said it "looks familiar" but added that he hadn't seen it until after the scheme had ended and the SEC had filed suit. The judge allowed the government to delete the addition even though, since Paladino's guilt de-

pended on what he knew when, the date on which he first saw the document was crucial.

In permitting the government to make this and other misleading deletions, the trial judge violated Fed. R. Evid. 106, which provides, so far as bears on this case, that when one party introduces in evidence a part of a writing, his opponent "may require the introduction…of any other part…which ought in fairness to be considered contemporaneously with it." See *United States v. Glover*, 101 F.3d 1183, 1189 (7th Cir. 1996); *United States v. Walker*, 652 F.2d 708 (7th Cir. 1981); *United States v. Burns*, 162 F.3d 840, 852–53 (5th Cir. 1998); *United States v. Sutton*, 801 F.2d 1346, 1368–70 (D.C. Cir. 1986). But the judge's error cannot help Paladino. He took the stand and could if he had wanted read to the jury the parts of the deposition that the government had suppressed. Cf. *United States v. Haddad*, 10 F.3d 1252, 1259 (7th Cir. 1993); *United States v. Sweiss*, 814 F.2d 1208, 1212 (7th Cir. 1987). He did not do this; instead he simply testified to his understanding of the documents about which the government had questioned him.

That was a tactical error. His testimony would have been more effective—in part because it would have demonstrated the government's mendacity—had he exposed the government's misleading editing. But as he had an opportunity to correct the record, he is left to argue only that he would not have taken the stand had he not been compelled by the trial judge's erroneous ruling (and erroneous it was) to rectify the government's misleading editing; he concludes that the ruling infringed his Fifth Amendment right not to be compelled to testify. But the Supreme Court has held that there is no compulsion in such a case, since the defendant has the option of refusing to testify and instead, if he is convicted, of obtaining appellate correction of the erroneous evidentiary ruling and with it a new trial. *Luce v. United States*, 469 U.S. 38, 41–43 (1984); see also *Ohler v. United States*, 529 U.S. 753, 758–59 (2000); *United States v. Saunders*, 359 F.3d 874, 877–78 (7th Cir. 2004); *United States v. Wilson*, 307 F.3d 596 (7th Cir. 2002); *United States v. Burrell*, 963 F.2d 976, 991–

92 (7th Cir. 1992); *United States v. Doyle*, 771 F.2d 250, 254–55 (7th Cir. 1985); *United States v. Bond*, 87 F.3d 695, 700–01 (5th Cir. 1996). The specific evidentiary error in *Luce* was improper impeachment with a prior conviction, but the principle is the same: "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify," 469 U.S. at 43; for "claim of improper impeachment with a prior conviction" read "claim of violation of Rule 106."

This rule puts the defendant to a hard tactical choice. But the alternative would be to give him two bites at the apple: testify, and try to win an acquittal; if that fails, appeal and get a new trial on the basis of the judge's ruling. *Freytag v. Commissioner*, 501 U.S. 868, 895 (1991). The Supreme Court prefers the first of these unsatisfactory resolutions to the second, and we are bound.

The only other nonsentencing issues in the appeal by Paladino and his confederates have no possible merit. They are Paladino's complaint about a variance between indictment and proof; his due process claim, which is based on an instruction; and Law's complaint about the judge's refusal to sever his trial from that of his codefendants. We move on, therefore, to Peyton's appeal. He was convicted by a jury of being a felon in possession of a firearm, namely a revolver found under the driver's seat of his car. A police officer, testifying as an expert witness on fingerprint evidence, said he'd been unable to find any fingerprints on the gun that could be used to identify who might have touched it. In answer to a question by the prosecutor, he testified that it was common to be unable to find usable fingerprints "at a crime scene or on an object." After the completion of the direct and cross-examination of the officer, the judge asked him how many times he'd tried to find fingerprints on handguns, and the officer replied, "Over a hundred," whereupon the judge remarked: "Okay. Contrary to what we might see on TV, is it likely or not likely to find latent prints on handguns"—to which the officer answered that it was unlikely.

What this line of inquiry had to do with Peyton's guilt is obscure. That there was no fingerprint evidence meant simply that there was no fingerprint evidence. Had Peyton's fingerprints been found on the gun, this would have helped the government and if someone else's fingerprints had been found on the gun, this would have helped Peyton because he testified that others had access to his car. Since no fingerprints were found, neither side was helped; and we can't see what difference it makes whether failure to find fingerprints on a gun is common or uncommon. In fact it is extremely common: "successful development of latent prints on firearms is difficult to achieve. In reality, very few identifiable latent prints are found on firearms, a fact that has been discussed in both literature and the judicial system." Clive A. Barnum & Darrell R. Klasey, "Factors Affecting the Recovery of Latent Prints on Firearms," *Prosecutor*, Jan./Feb. 1998, p. 32.

The issue, rather, is whether by seeking to clarify, and in fact reinforcing, the testimony of a government witness, the district judge signaled to the jury that he thought the defendant was guilty. Such signaling is improper. *United States v. Martin*, 189 F.3d 547, 553 (7th Cir. 1999); *Collins v. Kibort*, 143 F.3d 331, 336 (7th Cir. 1998); *United States v. Davis*, 285 F.3d 378, 381–82 (5th Cir. 2002); *United States v. Tilghman*, 134 F.3d 414, 416 (D.C. Cir. 1998). But since the question how often fingerprints are found on guns was of no actual relevance to Peyton's guilt, it is hard to believe that the jury was swayed, gratuitous though the judge's intervention was. In any event, the evidence of Peyton's guilt was conclusive, so the judge's error was harmless. Peyton admitted to the police that he had known the gun was in his car, and since he was driving the car he was in possession of the gun. The fact that, if he was believed, he had not placed the gun there was irrelevant. If someone hands you a gun and you put it in your pocket, you possess it; and it is the same here. See *United States v. Lane*, 267 F.3d 715, 718–19 (7th Cir. 2001)**;** *United States v. Wetwattana*, 94 F.3d 280, 283–84 (7th Cir. 1996); *United States v. Garrett*, 903 F.2d 1105, 1110–11 (7th

Cir. 1990); *United States v. Teemer*, 394 F.3d 59, 64 (1st Cir. 2005).

Turner was charged with possessing a revolver on January 30, 2003, in furtherance of a drug crime, and also with possessing a shotgun on the same day in furtherance of another drug crime. He received separate, consecutive sentences for the two crimes under 18 U.S.C. § 924(c), which punishes using or carrying a firearm "during and in relation to" a "crime of violence or drug trafficking crime." *United States v. Cappas*, 29 F.3d 1187, 1190–91 (7th Cir. 1994), holds that the offense defined by that statute is actually the use of one or more guns during or in relation to a drug offense, so had Turner used two guns during one offense he would have been guilty of only one violation of section 924(c). See also *United States v. White*, 222 F.3d 363, 373–74 (7th Cir. 2000); *United States v. Taylor*, 13 F.3d 986, 992–94 (6th Cir. 1994); *United States v. Lindsay*, 985 F.2d 666, 674 (2d Cir. 1993); *United States v. Smith*, 924 F.2d 889, 894–95 (9th Cir. 1991). But he was charged with two separate drug crimes, albeit committed on the same day, each involving a gun (different guns, though that is of no significance). In the morning, armed with a revolver, he sold crack to one person. In the afternoon, armed with a shotgun, he sold crack to another person. These were unquestionably separate drug offenses, and therefore his carrying of a gun during each of them constituted two violations of section 924(c). Compare *United States v. Cappas*, *supra*, 29 F.3d at 1190; *United States v. Johnson*, 977 F.2d 1360, 1376–77 (10th Cir. 1992); *United States v. Privette*, 947 F.2d 1259, 1262–63 (5th Cir. 1991). He complains that the instructions did not clearly require the jury to tie each gun to a different drug transaction. They indeed were unclear, but the evidence was unequivocal and so any error in the instructions was harmless.

Velleff raises only sentencing issues; and so it is to the sentencing issues presented by these consolidated appeals that we now turn. We begin with Paladino and his codefendants. He was sentenced to 72 months in prison and also ordered to pay restitution of $11–plus million, as were his co-

defendants. Iles was sentenced to 78 months, Law to 84, and Benson and Peitz to 188. The government concedes that all these sentences violated the Sixth Amendment right to trial by jury in federal criminal cases, as interpreted in *Booker*, because in all of them the judge had enhanced the sentences (for such aggravating circumstances as being an organizer of the fraudulent conspiracy or a supervisor of others involved in it, or abusing a position of trust) on the basis of facts not determined by the jury. The government contends, and we agree, that under the guidelines regime overthrown by *Booker* the sentences would have been lawful.

There are only two serious challenges to the enhancements. One is by Peitz, who claims that his trial lawyer gave him ineffective assistance by failing to argue that he should not be responsible for acts committed by his coconspirators within the scope of the conspiracy after he was expelled from it. The claim is premature, because there is no affidavit or other evidence from the lawyer indicating why he did not make the argument. He may well have had good tactical reasons. Without meaning to prejudice Peitz's claim should he choose to make it the basis of a motion under 28 U.S.C. § 2255, we remind him that a defendant who sets in motion a train of events foreseeably inflicting losses that in fact materialize cannot escape responsibility by quitting, let alone by being expelled from, the conspiracy. *United States v. Patel*, 879 F.2d 292, 294 (7th Cir. 1989); *United States v. Schweihs*, 971 F.2d 1302, 1323–24 (7th Cir. 1992); *United States v. Melvin*, 91 F.3d 1218, 1226–27 (9th Cir. 1996).

The issue is not whether reporting the conspiracy to the authorities is the only way of withdrawing from a conspiracy; it is merely one way. *United States v. Pandiello*, 184 F.3d 682, 687 (7th Cir. 1999); *United States v. Patel*, 879 F.2d 292 (7th Cir. 1989); *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964) (Friendly, J.). The issue is the form of withdrawal that will limit a conspirator's liability for losses that his own activity made more probable. As we explained in the *Patel* case, "having set in motion a criminal scheme, a conspirator will not be permitted by the law to limit his respon-

sibility for its consequences by ceasing, however definitively, to participate. Such cessation may or may not be effective withdrawal in a lay sense, but this is one of those places where the law uses a word in a special sense. You do not absolve yourself of guilt of bombing by walking away from the ticking bomb. And similarly the law will not let you wash your hands of a dangerous scheme that you have set in motion and that can continue to operate and cause great harm without your continued participation." 879 F.2d at 294. By communicating his withdrawal to the other members of the conspiracy, a conspirator might so weaken the conspiracy, or so frighten his conspirators with the prospect that he might go to the authorities in an effort to reduce his own liability, as to undermine the conspiracy. Peitz neither informed on the conspiracy so that the government could apprehend the other conspirators and by doing so prevent it from inflicting the losses that his own conduct had set the stage for, nor took any other measure to weaken the conspiracy; and so he remained liable for foreseeable losses inflicted by the conspiracy after his expulsion.

The other challenge to an enhancement is by Iles, who challenges the finding that she abused a position of trust. The finding is based on evidence that she invited potential investors to entrust her with their money, assuring them that it would be safe in her hands. By establishing a fiduciary relationship with them she acquired a position of trust that she abused, as in *United States v. Frykholm*, 267 F.3d 604, 612–13 (7th Cir. 2001).

Peyton was sentenced to 180 months in prison, the statutory minimum because of his recidivist status as determined by the trial judge. His only challenge to the sentence is that the facts underlying the determination of that status were found by the judge rather than by the jury, and the challenge fails under *Harris v. United States*, 536 U.S. 545 (2002); cf. *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). The government cross-appealed, complaining about the judge's departing downward from the guidelines range of 235 to 293 months to the statutory minimum, but it later moved

to withdraw the appeal and we granted the motion. The district judge had departed downward on two grounds: that Peyton had provided impressive evidence of rehabilitation, during the year in which he was free on bail prior to his sentencing, by abstaining from alcohol, living amicably with his wife, holding a steady job, and counseling his children to avoid following in his criminal footsteps, and also that his criminal history overstated his recidivist proclivities because most of his prior crimes had been committed during a single spree. The government argued in its cross-appeal that the facts did not justify such a departure from the guidelines range, and this may be correct (we need not decide) under the rules that prevailed when the guidelines were mandatory. But now we know that the guidelines are advisory, and so the question is whether, if the judge again resentenced Peyton to 180 months on the same ground on which he based the original sentence, we would reverse on the ground that the 180-month sentence was unreasonable. Under the new sentencing regime the judge must justify departing from the guidelines, and the justification has to be reasonable, but we cannot think on what basis a 15-year sentence for Peyton, who was 34 years old when sentenced, could be thought unreasonably short. The issue is academic, since the cross-appeal has been dismissed. But for future reference it is worth noting that there are cases in which one can be certain that the judge would not have given a different sentence even if he had realized that the guidelines were merely advisory.

Turner was sentenced to 613 months in prison. A substantial portion of the sentence was based on findings by the judge, but not the jury, regarding the quantity of crack that he had sold and other circumstances of his crime. Velleff was sentenced to 430 months for robbery and for drug and gun offenses. Some of the time was due to a recidivist enhancement not affected by *Booker*, which did not overrule *Almendarez-Torres*, but some was based on mandatory provisions of the sentencing guidelines.

Had the judgments become final before the Supreme Court decided *Booker*, the defendants would be out of luck, because *Booker* is not retroactive. *McReynolds v. United States*, 2005 WL 237642 (7th Cir. Feb. 2, 2005); see also *Green v. United States*, 2005 WL 237204, at *1 (2d Cir. Feb. 2, 2005) (per curiam); *In re Anderson*, 2005 WL 123923, at *3–4 (11th Cir. Jan. 21, 2005). Had the defendants raised a *Booker* issue in the district court, we would review the resolution of the issue in the ordinary way. But because they failed to do so, and acknowledge that our review is for "plain error" only, we must decide whether the sentencing errors of which they complain were indeed "plain."

Since all the sentences were within the sentencing range that Congress had created for these defendants' conduct, the district judge could give them identical sentences without violating the Sixth Amendment. The government argues that, since the defendants cannot prove otherwise, the judges' error in thinking themselves bound by the guidelines was not a plain error, and so we should affirm the sentences.

An error is plain, first of all, if it is clearly an error, and that criterion is satisfied in cases such as these after *Booker*. But it must also affect the defendant's "substantial rights" and, in addition, "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 466–67 (1997); see also *United States v. Young*, 470 U.S. 1, 15–16 (1985); *United States v. Esterman*, 324 F.3d 565, 569–73 (7th Cir. 2003); *United States v. Nance*, 236 F.3d 820, 825–26 (7th Cir. 2000); *United States v. Brennan*, 395 F.3d 59, 71 (2d Cir. 2005). This last criterion is usually equated to causing a "miscarriage of justice," *United States v. Frady*, 456 U.S. 152, 163 n. 14 (1982); *United States v. Allen*, 390 F.3d 944, 947–48 (7th Cir. 2004); *United States v. Lechuga*, 994 F.2d 346, 351 (7th Cir. 1993) (en banc); *United States v. Bradley*, 390 F.3d 145, 152 (1st Cir. 2004), that is (in the context of the guilt phase of the criminal proceeding), to creating a substantial risk of convicting an innocent person, since such a conviction certainly challenges the fairness, integrity, and public reputation of judicial proceed-

ings. The reason for the heavier burden of overturning a conviction or sentence when the defendant failed to advance the ground for his challenge in the district court is the prejudice to the government from having been deprived of an opportunity to meet the challenge, and the additional work piled on the district court of conducting further proceedings that would have been unnecessary had the defendant advanced his objection to conviction or sentence in a timely fashion.

The question is how much heavier the burden of overturning is. The difference between the "substantial rights" and "fairness, integrity, or public reputation" elements of the plain-error standard is not entirely clear. One possibility, suggested by *United States v. Olano*, 507 U.S. 725, 734–35 (1993), and the numerous cases that speak in terms of "miscarriage of justice," is that the first element merely requires prejudice, in the sense that the verdict might have been different, whereas the second requires confidence that if the error is not corrected the result will be intolerable, such as the conviction of an innocent person or subjecting a guilty person to an illegally long sentence. An error can be prejudicial without being intolerable, because it might be apparent that a retrial or a resentencing would lead to the same result. *Johnson v. United States, supra*, 520 U.S. at 468–70, the canonical modern statement of the plain-error standard, suggests that "substantial rights" may mean simply important rather than merely technical rights and that "fairness, integrity, and public reputation" may refer simply to prejudice, that is, the likelihood that the verdict, or sentence, challenged on appeal was actually affected by the error. Yet *United States v. Dominguez Benitez,* 124 S.Ct. 2333, 2339–41 (2004), tacks back toward the *Olano* approach. This difference in understandings of the plain-error standard, if more than verbal, might be important in some cases, but not in the cases before us, for there may have been plain error here even under the more stringent reading, which requires proof of a miscarriage of justice in the sense that we have indicated.

We do not have a question of guilt or innocence; the defendants are guilty. The issue is the meaning of plain error in the context of an illegal sentence. The government's basic position is that if a sentence was legal before *Booker*, it cannot be plainly erroneous; because the guidelines remain valid, albeit demoted to being merely advisory, a sentence that complies with them would be very unlikely to be reversed. The argument rests on a misunderstanding of the difference between the guilt phase of a case and the punishment phase. Guilt is either-or; the defendant is either guilty or innocent. If an error is committed and the defendant is convicted, the appellate court has only to consider whether the defendant would probably have been acquitted had the error not occurred. If so—if the error may well have precipitated a miscarriage of justice (which the conviction of an innocent person is)—it is a plain error and the defendant is entitled to a new trial. But sentencing is not either-or; it is the choice of a point within a range established by Congress, and normally the range is a broad one. There are exceptions, notably where the choice is between death and prison; then, as in *Jones v. United States*, 527 U.S. 373, 402–05 (1999), it may be feasible for the appellate court to determine that despite the error the choice would have been the same. Cf. *United States v. Cotton*, 535 U.S. 625, 633–34 (2002). That is not true here; here, unless any of the judges in the cases before us had said in sentencing a defendant pre-*Booker* that he would have given the same sentence even if the guidelines were merely advisory (which none of the judges did say), it is impossible for a reviewing court to determine—*without consulting the sentencing judge* (a pregnant qualification, as we are about to see)—whether the judge would have done that.

The government argues that if, as happened in several of the cases, the judge imposed a sentence higher than the guideline minimum, this shows that he wouldn't have imposed a lighter sentence even if he had known the guidelines were merely advisory. *United States v. Bruce*, 2005 WL 241254, at *18 (6th Cir. Feb. 3, 2005). We disagree. A conscientious judge—one who took the guidelines seriously what-

ever his private views—would pick a sentence relative to the guideline range. If he thought the defendant a more serious offender than an offender at the bottom of the range, he would give him a higher sentence even if he thought the entire range too high.

Even in cases in which there is a broad sentencing range, it may sometimes be possible for an appellate court to be confident that the sentencing judge would have given the sentence he did even if he had not misunderstood the legal effect of the guidelines. It would be the mirror image of Peyton's case, where we expressed confidence that the judge would not have imposed a heavier sentence had he known the guidelines were not binding; for he gave Peyton a term of imprisonment that was not only four and a half years below the lowest point in the applicable guideline range but was the lightest sentence that the applicable statute permitted him to give. Similarly, if a judge were to impose a sentence at the statutory maximum and say that if he could he would have imposed an even longer sentence, there would be no basis for thinking that if he had known that the sentencing guidelines are merely advisory he would have given the defendant a lighter sentence.

But if as in the cases before us the sentencing judge might well have decided to impose a lighter sentence than dictated by the guidelines had he not thought himself bound by them, his error in having thought himself bound may have precipitated a miscarriage of justice. It is a miscarriage of justice to give a person an illegal sentence that increases his punishment, just as it is to convict an innocent person. *United States v. Pawlinski*, 374 F.3d 536, 540–41 (7th Cir. 2004); *United States v. Newman*, 965 F.2d 206, 213 (7th Cir. 1992); *United States v. Syme*, 276 F.3d 131, 158 (3d Cir. 2002); *United States v. Portillo-Mendoza*, 273 F.3d 1224, 1228 (9th Cir. 2001); compare *United States v. Moyer*, 282 F.3d 1311, 1319 (10th Cir. 2002). As we said in *Pawlinski*, "the entry of an illegal sentence is a serious error routinely corrected on plain-error review." 374 F.3d at 541. To tell a defendant we know your sentence would have been 60

months shorter had the district judge known the guidelines were merely advisory, because he's told us it would have been—but that is your tough luck and you'll just have to stew in prison for 60 additional months because of an acknowledged violation of the Constitution—would undermine the fairness, the integrity, and the public repute of the federal judicial process. *United States v. Davis*, 2005 WL 334370, at *8 (3rd Cir. Feb. 11, 2005); *United States v. Ameline*, 2005 U.S. App. LEXIS 2032, at *18-20 (9th Cir. Feb. 9, 2005), amended, 2005 U.S. App. LEXIS 2178 (9th Cir. Feb. 10, 2005); *United States v. Oliver*, 2005 WL 233779, at *8 (6th Cir. Feb. 2, 2005); *United States v. Hughes*, 396 F.3d 374, 381 (4th Cir. 2005). The sentencing phase of a prosecution is not to be taken lightly, as we know from *Glover v. United States*, 531 U.S. 198 (2001), where the Supreme Court rejected this court's holding in *Durrive v. United States*, 4 F.3d 548, 550–51 (7th Cir. 1993), that an error by counsel that resulted in a higher sentence for his client did not violate the right to effective assistance of counsel unless the higher sentence was unfair. See also *United States v. Adams*, 252 F.3d 276, 282–89 (3d Cir. 2001).

The equal and opposite error is to assume that every sentence imposed in violation of the Sixth Amendment and therefore of *Booker* is plainly erroneous and thus automatically entitles the defendant to be resentenced. That is the error committed by the Sixth Circuit in *United States v. Oliver*, *supra*, at *8, and the Fourth Circuit in *United States v. Hughes*, *supra*, 396 F.3d at 380–81. What these courts overlooked is that if the judge would have imposed the same sentence even if he had thought the guidelines merely advisory (in which event there would have been no Sixth Amendment violation), and the sentence would be lawful under the post-*Booker* regime, there is no prejudice to the defendant.

The only practical way (and it happens also to be the shortest, the easiest, the quickest, and the surest way) to determine whether the kind of plain error argued in these cases has actually occurred is to ask the district judge. We agree, therefore, with the Second Circuit's ruling in *United*

*States v. Crosby*, 2005 WL 240916, at *11 (2d Cir. Feb. 2, 2005), that what an appellate court should do in *Booker* cases in which it is difficult for us to determine whether the error was prejudicial is, while retaining jurisdiction of the appeal, order a limited remand to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence. See also *United States v. Williams*, 2005 WL 425212 (2d Cir. Feb. 23, 2005). If so, we will affirm the original sentence against a plain-error challenge provided that the sentence is reasonable, the standard of appellate review prescribed by *Booker*. 125 S. Ct. at 765. The proviso is important; the mere reimposition of the original sentence does not insulate it from appellate review under the new standard.

If, on the other hand, the judge states on limited remand that he would have imposed a different sentence had he known the guidelines were merely advisory, we will vacate the original sentence and remand for resentencing. In formulating the statement (whether the judge's conclusion is that he would, or would not, adhere to the original sentence), "the District Court should obtain the views of counsel, at least in writing, but 'need not' require the presence of the Defendant, *see* Fed.R.Crim.P. 43(b)(3). Upon reaching its decision (with or without a hearing) whether to resentence, the District Court should either place on the record a decision not to resentence, with an appropriate explanation," *United States v. Crosby*, *supra*, at *13, or inform this court of its desire to resentence the defendant. (By "should" in the quoted passage we understand "must.") We will then vacate the sentence and, "with the Defendant present, [the district court shall] resentence [the defendant] in conformity with the SRA [and] *Booker/Fanfan*,…including an appropriate explanation, *see* § 3553(c)." *Id*. Our procedure is not identical to that set forth in *Crosby*, though it is very close. *Crosby* envisages the district judge as vacating the original sentence if the judge wants to resentence the defendant. Under our procedure, since we retain jurisdiction throughout the limited remand, we shall vacate the sentence upon being notified by the judge

that he would not have imposed it had he known that the guidelines were merely advisory.

The Sixth Circuit, in *United States v. Milan*, 2005 WL 309934 (6th Cir. Feb. 10, 2005), rejected *Crosby* on the ground that the Supreme Court in *Booker* had remanded the case for resentencing. But in so ruling the Sixth Circuit overlooked the fact that the government had waived the argument that Booker's appeal was governed by the plain-error standard, as we had noted in our decision in *Booker*, which the Supreme Court affirmed. *United States v. Booker*, 375 F.3d 508, 515 (7th Cir. 2004). The Supreme Court made no ruling, express or implied, on the proper standard of plain-error analysis in cases such as this.

The Eleventh Circuit, while agreeing with the Second that it is impossible for a reviewing court to know what sentence a district judge would have given had he known the guidelines were merely advisory, concluded that this means that a defendant in such a case cannot show that his substantial rights have been affected; cannot, therefore, establish plain error. *United States v. Rodriguez*, 2005 WL 272952 (11th Cir. Feb. 4, 2005). Given the alternative of simply asking the district judge to tell us whether he would have given a different sentence, and thus dispelling the epistemic fog, we cannot fathom why the Eleventh Circuit wants to condemn some unknown fraction of criminal defendants to serve an illegal sentence. *Crosby* is the middle way between placing on the defendant the impossible burden of proving that the sentencing judge would have imposed a different sentence had the judge not thought the guidelines mandatory and requiring that all defendants whose cases were pending when *Booker* was decided are entitled to be resentenced, even when it is clear that the judge would impose the same sentence and the court of appeals would affirm.

To summarize, we affirm all the convictions and Peyton's sentence; we direct a limited remand of the remaining sentences in accordance with the procedure set forth above, thus retaining appellate jurisdiction.

Because this opinion establishes a new rule for the circuit, it was circulated to the entire court before issuance. 7th Cir. R. 40(e). All but two members of the court in regular active service voted not to hear the case en banc. Judges Ripple and Kanne voted to hear it en banc.

RIPPLE, *Circuit Judge*, dissenting from the denial of rehearing en banc.  In the few short weeks since the Supreme Court's decision in *United States v. Booker,* 125 S. Ct. 738 (2005), the courts of appeals across the Country have produced a significant number of opinions setting forth a broad spectrum of approaches designed to implement the Supreme Court's decision.  The panel opinion before us sets forth the holdings of the first generation of those various cases and then presents a variation of one.  Today's panel opinion thus initiates the second generation of post-*Booker* opinions, variations on the themes set forth in the first generation of opinions.  No doubt, before the vernal equinox arrives, these second generation opinions will produce a further variation and a third generation of opinions will be upon us.  Complexity will complicate complexity.  The companies that produce the reports of our opinions will be delighted; the notes and comments editors of the Nation's law reviews will have sufficient fodder for all of next year's crop of aspiring editors--and the federal courts will raise serious doubts about their capacity to govern.

Is this the course that the Supreme Court expected would follow its pronouncement in *Booker*?  Are we to attribute to the Court a desire that the Nation's intermediate courts of appeals develop elaborate and diverse approaches to *Booker*'s holding. There are, no doubt, times when a Supreme Court decision is intended to encourage intermediate appellate courts to address unresolved issues and for the intermediate courts' resolution of those issues to percolate to the Supreme Court. But the situation presented by *Booker* is hardly one.  The entire federal criminal justice system came to a standstill in anticipation of the Court's decision in *Booker*.  Now that the Court has ruled, it is time to implement its decision-- immediately and forthrightly.

As a threshold matter, then, we ought to pause and reflect on the reason for this plethora of diverse approaches, churned out by the courts at a pace that obviously has precluded

the sort of reflection and open collegial consultation that ought to be  part and parcel of the process of deciding an appellate case.

One possible reason for such a judicial behavior pattern would be the novelty of the Supreme Court's decision. However, we are not confronted with such a once-in-a-century situation. The situation before us is not unique:  We simply must implement a decision that holds that the sentencing procedure employed in the federal courts is unconstitutional because it denies the right to a jury trial.  We are asked to see that individuals illegally sentenced to prison are relieved of the burden of serving a sentence imposed under such an unconstitutional system.

In my view, the approach formulated by the panel suffers from two basic infirmities.  First, as Judge Kanne convincingly points out, the abbreviated "quick look" required of a district court is hardly a substitute for the sentencing process that the Supreme Court now has said is mandated by our Constitution. Until the district court undertakes a new sentencing process-- cognizant of the freedom to impose any sentence it deems appropriate as long as the applicable guidelines range and the 18 U.S.C. § 3553(a) factors are considered--the district court cannot accurately assess whether and how its discretion ought to be exercised.  The panel's holding requires the court to pre-judge and to pre-evaluate evidence it has not heard.  Sentencing after *Booker* will raise subtle issues as to how much emphasis ought to be given to particular facts and circumstances.  This task can be accomplished competently only after hearing witnesses and seeing the evidence.  In short, what the panel substitutes for the usual judicial reaction to an unconstitutionally-imposed sentence is a process that simply is inadequate to the task.

In all too many instances, the process scripted by the panel will serve as an invitation for the district court to give

only a superficial look at the earlier unconstitutionally-imposed sentence. The constitutional right at stake hardly is vindicated by a looks-all-right-to-me assessment by a busy district court. Indeed, *if* we wanted to drag our collective judicial feet and ensure that the Supreme Court's decision had minimal impact (a motivation I certainly do *not* attribute to my colleagues), it would be difficult to come up with a better device than the one crafted by the panel opinion.[1]

In addition to mandating an enfeebled mechanism for the correcting of the unconstitutional process identified by the Supreme Court, the panel opinion also has introduced into our decisions a new rigidity with respect to our formulation of the plain error doctrine--a rigidity that I fear my colleagues will regret long after the "*Booker* cases" are a faded memory.

The Supreme Court has recognized that "[n]ormally, *although perhaps not in every case*, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)." *United States v. Olano*, 507 U.S. 722, 735 (1993) (emphasis supplied). However, we have never required this specific showing of prejudice in circumstances in which the error has denied the defendant a constitutionally-mandated process and when the outcome of that process cannot be known until the process actually takes place. Rather, in such contexts, we have ordered resentencing when a distinct possibility exists that the error influenced the district court's selection of a particular sentence. For instance, we have remanded sentences that fell in the overlap of an erroneously applied sentencing range and the correct guidelines range, "'unless we have reason to believe that the error did not affect the district court's selection of a particular sentence.'" *Emezuo*

---

[1]    *Cf. United States v. Williams*, No. 04-2882, slip op. at 16 (2d Cir. Feb. 23, 2005) (defending a truncated procedure partially on the ground that it avoids administrative burdens).

*v. United States*, 357 F.3d 703, 711 (7th Cir. 2004) (quoting
*United States v. Wallace*, 32 F.3d 1171 (7th Cir. 1994); *see
United States v. Sofsky*, 287 F.3d 122, 125 (2d Cir. 2002)
(relaxing the otherwise rigorous plain error review standards to
correct unobjected error because the error related to sentencing
and the defendant lacked prior knowledge that the erroneous
sentencing condition would be imposed); *United States v. Plaza-
Garcia*, 914 F.2d 345, 347-48 (1st Cir. 1990) (vacating sentence
under the plain error doctrine that fell within incorrect and
correct guidelines range because the sentence "may well have
been influenced by the [erroneous] sentencing
recommendation"); *see also United States v. Reyna*, 358 F.3d
344, 351 (5th Cir. 2004) (presuming prejudice when the district
court failed to allow defendant to allocute, because of the nature
of the right and the difficulty of proving the violation affected a
specific sentence); *United States v. Adams*, 252 F.3d 276 (3d Cir.
2001) (same).

The panel decision today offers a superficially pragmatic,
but not a principled, basis for adopting its novel approach to
plain error analysis.  Particularly troubling, in terms of its long-
term impact, is the delegation to the district court of *our* judicial
responsibility to evaluate plain error on an independent basis.
*See United States v. Domiguez Benitez*, 124 S. Ct. 2333, 2340
(2004) ("A defendant must thus satisfy the judgment *of the
reviewing court . . . .*").  Indeed, even when viewed as a
"pragmatic" response to *Booker*'s mandate, the panel's hastily
constructed procedure falls on its own sword.  The panel never
tells us what it plans to do with cases in which retirement,
disability or death has made impossible consultation with the
district judge who imposed the unconstitutional sentence.  Even
when such consultation is possible, our case tracking computer
programs will get quite a workout, and we certainly shall see
another New Year come and go before this situation no longer
impedes our regular work.  The Supreme Court has told us that
one of the reasons for plain error review is to reduce the burden
on the judicial system.  *See Johnson v. United States*, 520 U.S.

461, 468 (1997).  It is indeed difficult to see how the odyssey on which the panel now sends us will do anything other than tie us in knots.[2]

 *Booker* requires a simple, direct remedy to those harmed by the unconstitutional procedure of former times.  We would best serve justice by implementing the Supreme Court's mandate quickly and efficiently.  I respectfully dissent.

---

 [2] *Cf. Williams*, slip op. at 20 n.15 (criticizing the procedure scripted by the panel opinion as introducing a "needless yo-yoing between the appellate court and the district court").

KANNE, *Circuit Judge*, dissenting from the denial of rehearing en banc. I concur with all aspects of the panel's opinion issued today—except for the proposed mechanism to remedy the unconstitutionally imposed sentences. I believe that the sentences must be vacated and remanded to the district courts for resentencing in light of *Booker*.

In *Booker*, the Supreme Court stated that enhancements resulting from judge-found (rather than jury-found or admitted) facts violate the Sixth Amendment. 125 S. Ct. at 755-56. Importantly, Booker's companion petitioner, Fanfan, had received a sentence that did not violate the Sixth Amendment but was nonetheless deemed unconstitutional because it was imposed under a mandatory Guidelines regime. *Id.* at 768. *Any* sentence handed down under a mandatory guideline regime is unconstitutional. The solution selected by the panel (a limited remand, simply asking the district judge whether there was a "miscarriage of justice") does not fully rectify this problem.

In the post-*Booker* world, sentencing judges have discretion to weigh a multitude of factors that were not ordinarily relevant or appropriate to consider under the previous regime. *See, e.g.*, U.S.S.G. § 5H1 (specific offender characteristics including age, family ties and responsibilities, and employment record). These are the very factors that might convince a judge to resentence. The panel's limited remand leaves open the possibility that these factors might come to light in a hearing conducted by the district court, but there is no guarantee that such a hearing will be held—and if we retain jurisdiction as the panel would have it, it is unclear that a district judge could even compel such a hearing.

Certainly, we can anticipate that some district judges will opt not to have a hearing and simply choose not to resentence, at which point we may be required to review the standing sentence for reasonableness. But surely reasonableness depends not only on the length of the sentence but on the

process by which it is imposed. The record in the case in which there was no resentencing (or hearing on the issue) will be impossible for us to review for reasonableness, if reasonableness is to be determined with regard to all of the "the numerous factors that guide sentencing." *See Booker*, 125 S. Ct. at 765-66. We know now that the universe of factors that guides sentencing is larger than it was pre-*Booker*, and defendants should have the opportunity to argue these factors in a full resentencing hearing and have them reflected in the record. It is the only way to know whether a different sentence would have been imposed under advisory guidelines. To deny defendants this opportunity is a "miscarriage of justice" and thus is necessarily plain error.

Therefore, the necessary approach is to vacate all the sentences so that new ones are imposed in accord with *Booker*—constitutionally, under an advisory Guideline system—that would allow the judge to exercise discretion in sentencing. This is the approach that has been adopted by the Fourth, Sixth, and Ninth Circuits. *United States v. Hughes*, 396 F.3d 374 (4th Cir. 2005); *United States v. Ameline*, No. 02-30326, 2005 WL 350811 (9th Cir. Feb. 10, 2005); *United Sates v. Milan*, No. 02-6245, 2005 WL 309934 (6th Cir. Feb. 10, 2005). I read the panel's approach as an ad hoc procedure through which the district court can elect not to exercise its sentencing discretion as *Booker* requires. It is hard to see how, without a hearing and briefing tantamount to resentencing by normal vacatur and remand procedures, a district court could ever give "an appropriate explanation" for its decision not to resentence. If a district judge chooses not to resentence (especially without a hearing), that judge is effectively letting stand a sentence imposed under an unconstitutional regime.