# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3014

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ROBERT L. WILSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 638—**James B. Moran**, *Judge.*

ARGUED JANUARY 14, 2002—DECIDED OCTOBER 3, 2002

Before POSNER, RIPPLE, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* A jury found Robert Wilson guilty of participation in a wire fraud scheme, and he was sentenced to 23 months' imprisonment. He claimed at trial that he should have been allowed to introduce some exculpatory evidence without opening the door to the government's use of evidence of his post-arrest silence. He is now before this court on a direct appeal of his conviction. Finding no error in the district court's rulings, we affirm.

**I**

Robert Wilson worked at the relevant time for Designer Financial, a mortgage company. Between 1997 and 1999, his annual income never exceeded $36,000, and he did not report substantial real estate commissions on his tax returns.

In August 2000, Wilson had a joint account and an individual account at Bank One. As of August 1, 2000, the joint account had a negative balance of $13,330, and the individual account had a negative balance of $21. Two days later, Homeside Lending (his mortgagee) began fore-closure proceedings on Wilson's home, because Homeside had not received any payments for about a year. Atlantic National Trust was in worse shape; it held a second mort-gage and had not been paid by Wilson since November 1998.

On August 4, 2000, a mysterious $180,000 was deposited by wire transfer into Wilson's personal account, originat-ing from Citibank in New York. The transfer came from a "Mr. Bean" account at Charles Schwab. The history of this transfer is at the basis of the charges against Wilson.

On July 26, a Schwab employee received a call from a man who identified himself as John Bean, who asked to change his daytime phone number. The number was changed to a cell phone. Records for that cell phone num-ber show that a call was placed from the same telephone to Designer Financial—where Wilson worked—on the same day.

On August 3, Schwab received a wire transfer author-ization form requesting a $180,000 transfer from the account of John and Olga Bean to Wilson's account. It purported to be signed by the Beans, but they testified at trial that they did not sign the form. It also contained a Schwab authorization stamp, bearing the signature of a Mr. Earl King. King, who at the time was a Vice Pres-

ident of Schwab, testified at trial that the authorizing signature was not his.

After the money reached Wilson's account, he transferred the $180,000 from the joint account into the individual account. He then transferred $35,000 back into the joint account. The effect of these transfers was to make the funds available immediately. On August 5, Wilson made at least two withdrawals from the individual account: a check for $16,000 to Homeside Lending and one to R.J. and Tressy Stowers for $5,500. The Stowerses' check was a repayment of earnest money on a house purchase that was never completed. Bank One did not honor this check, and when the Stowerses called Wilson to complain, he said they should have cashed it at a currency exchange office.

On August 7, Wilson requested Bank One to transfer $90,000 from his individual account into that of Head Jerk House at TCF Bank. On the same day, Wilson obtained from his individual account three cashier's checks for a total of $23,542. One check was made payable to Scott Gillespie, and the other two were for an apparently fictitious William Emlund. A fingerprint on an Emlund check matched that of Robert Mitchell, a convicted felon, who testified that he received the check from Tim Mars, a friend, who offered him $500 to cash the check and provided him with a phony Emlund identification. When Mitchell presented the Emlund check and the ID to a teller, he was asked to put his fingerprint on the check. While the teller checked it out, Mitchell became nervous and left the bank, leaving behind both the check and the fake ID. (The second of the Emlund checks was cashed at a currency exchange office in September, endorsed in the name of Robert Wilson.)

On the same day, an employee of Bank One received a call from someone identifying himself as Robert Wilson,

who asked for the return of the Emlund check and the ID. Telephone records showed a call placed to Bank One from a telephone registered in Wilson's wife's name; other records showed that the same telephone later called a number registered to Tim Mars.

The next day, August 8, a man identifying himself as Robert Wilson called Bank One, asking what the problem was with cashing the cashier's check and why the bank was holding up a $90,000 wire transfer. A bank representative asked Wilson to come to the bank the next day to discuss the issue.

On August 9, FBI Agent Dale Shelton posed as a Bank One employee and met with Wilson to discuss the activity on the account. During the meeting, Wilson stated that the $180,000 wire transfer represented his and his partner's commission on a real estate development project in the Bahamas valued at $60 million, and stated that it originated from the account of a certain Bean. (In December 1999, Wilson had sent a fax to Ace Capital Corporation (Ace), asking for a $2 million financial guarantee bond for the development of property in the Bahamas. Ace did not issue the guarantee.)

At the end of this meeting, Agent Shelton arrested Wilson and gave him his *Miranda* warnings. Wilson orally waived his rights (though he refused to sign a written waiver) and allowed Agent Shelton to interview him. In the course of that interview, Wilson answered a number of questions about the wire transfer. He stated that he had been working with an associate on a real estate project related to the transfer, but when asked, expressly refused to provide the name of that associate. He was also questioned about the Emlund checks. He told Agent Shelton that they were going to be used to purchase vehicles from Mr. Emlund, whom he had met through a friend. As to the Gillespie check, he stated that he owed a

friend a debt, and the friend had directed that the payment be made to a Scott Gillespie. He also stated that the $180,000 had been wire-transferred by someone named Bean, who was an investor with a project in the Bahamas.

Prior to Wilson's trial, the defense made an oral motion to preclude the government from introducing evidence of Wilson's post-arrest selective silence. The district court granted the motion in part, ruling that the government could not use this evidence in its case in chief. At trial, Agent Shelton testified about Wilson's statements regarding the Emlund and Gillespie checks. The prosecutor then asked him: "And what if anything did [Wilson] say about an associate of his?" Shelton began to reply as follows: "He stated that an associate of his had—I am not clear on the question actually," after which the government withdrew the question.

Later in the trial, the defense proposed calling Agent Shelton to the stand to introduce Wilson's statement with respect to the purported associate. The defense argued that the earlier exchange with Agent Shelton had placed the issue of the associate in front of the jury and completeness required that the defense fill in the story, but somehow without the government's bringing in the selective silence.

The trial court held that if Wilson brought up the matter of the associate, then the government would be allowed at that time to introduce evidence of his refusal to name the associate during the interview with Agent Shelton. Given this choice, the defense decided not to bring in its story. This meant that the jury never heard part of Wilson's alibi, but it also never heard the government's evidence of Wilson's refusal to answer the more specific questions.

The defense also sought to introduce the testimony of an agent from the Securities and Exchange Commission (SEC) and the introduction of a Consent Order and Com-

plaint relating to a Mr. Alan Gibbons. The idea behind this was that Gibbons had entered into a Consent Order with the SEC because he had defrauded investors for a total of approximately $172,000; he had later submitted a sworn statement that he had no funds; and on July 12, 2000, Gibbons had opened a Schwab account with a $41,000 check drawn on a Bahamian corporation. On July 26, an account of Gibbons's in the name of his corporation received a fraudulent wire transfer of $160,000 out of the John Bean account. The SEC witness would have testified that it would have the right under the terms of the consent order to seize any funds owed by Gibbons up to $172,000. This rather peripheral information, Wilson believed, would have helped his case.

## II

Wilson contends that his Fifth Amendment right to remain silent was violated by the district court's decision conditionally to allow the government to introduce evidence of Wilson's "selective silence," if Wilson himself decided to refer to the "associate" he had originally mentioned to Agent Shelton. He further argues that the trial court violated his Sixth Amendment rights by refusing to allow the SEC witness to testify and by refusing to permit the introduction of the Gibbons documents.

The propriety of a ruling allowing the introduction of evidence is reviewed for abuse of discretion if the defendant objected at trial. *United States v. Miller*, 159 F.3d 1106, 1112 (7th Cir. 1998). Whether the court's evidentiary ruling (taking into account the permissible scope of the court's discretion) had the effect of infringing the defendant's constitutional rights is a question of law we consider *de novo*. *United States v. Hernandez*, 84 F.3d 931, 933 (7th Cir. 1996).

A

The first question we must consider is whether we should be looking at the proposed use of Wilson's silence at all. Wilson was given a choice by the district court. This choice, he argues, put him on the horns of a dilemma: he could either explore the issue of his alleged associate, at the price of having the jury hear about his invocation of his right to silence, or he could say nothing about the associate and keep out the testimony about the selective silence. At the trial, Wilson resolved the problem by declining to introduce the part of his post-arrest statement that related to an associate; thus, the government never introduced the other part of the statement in which Wilson declined to name the associate. The government now argues that having elected not to risk the admission, Wilson waived the right to challenge the ruling on the issue. It relies on *Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999) (*en banc*) for this proposition. It contends that a "good example of a conditional ruling is a judge's statement that, if a litigant testifies, then the adverse party will be entitled to cross-examine in such-and-such a way. Until the condition has been satisfied by the testimony, the ruling has no effect." *Id.* at 565.

In *Luce v. United States*, 469 U.S. 38, 41 (1984), the Supreme Court recognized the difficulty a trial court faces when it is asked to make a ruling in the abstract about the consequences of a defendant's testimony. Luce, on trial in federal court on drug charges, moved to preclude the government from introducing evidence of his prior conviction to impeach him if he testified. Like Wilson, he did not commit to testifying if the motion was granted, and no adequate proffer was made as to what the testimony would be if it indeed took place. *Id.* at 39. Luce ended up not testifying and was convicted. The trial court had made a conditional ruling that the evidence would have been admissible. The Supreme Court agreed

that the ruling could not be reviewed, because it was speculative whether the government's impeaching evidence would even have been introduced, and it could not assume that the conditional ruling was the reason for the defendant's decision not to testify. *Id.* at 41-42. As the government's evidence never came in, it was impossible to determine whether it had negatively and impermissibly affected the jury. In order to preserve the right to challenge the evidentiary ruling, Luce would have had to introduce his evidence, object to the government's evidence (if indeed it was brought in), and then appeal if he was convicted.

Other circuits have extended the *Luce* principle beyond its original context of FEDERAL RULE OF EVIDENCE 609. See *United States v. DiMatteo*, 759 F.2d 831, 832 (11th Cir. 1985) (applying *Luce* where the defendant's witness would be impeached with evidence offered under Rule 608). See also *United States v. Goldman*, 41 F.3d 785, 788 (1st Cir. 1994) ("Although *Luce* involved impeachment by conviction under Rule 609, the reasons given by the Supreme Court for requiring the defendant to testify apply with full force to the kind of Rule 403 and 404 objections that are advanced by Goldman in this case."); *Palmieri v. DeFaria*, 88 F.3d 136, 140-41 (2d Cir. 1996) (where the plaintiff decided to take an adverse judgment rather than challenge an advance ruling by putting on evidence at trial, the *in limine* ruling would not be reviewed on appeal); *United States v. Ortiz*, 857 F.2d 900, 905 (2d Cir. 1988) (where uncharged misconduct is ruled admissible if the defendant pursues a certain defense, the defendant must actually pursue that defense at trial in order to preserve a claim of error on appeal); *United States v. Bond*, 87 F.3d 695, 701 (5th Cir. 1996) (where the trial court rules *in limine* that the defendant would waive his fifth amendment privilege were he to testify, the defendant must take the stand and testify in order to challenge that ruling on appeal).

Following this line of cases, we agree that it is inappropriate for us to review Wilson's claim on the merits here. He exercised his constitutional right to refrain from introducing certain evidence at the trial and cannot now attack a potential introduction of evidence by the government in response to his potential testimony. We therefore do not address his arguments with respect to the alleged violation of his Fifth Amendment rights.

B

Wilson also appeals the trial court's decision to exclude the testimony of an SEC agent regarding the consent and stipulation of Alan Gibbons. Defense counsel's offer of proof indicates that the agent would have testified that Gibbons risked having funds up to $172,000 seized if the money had been found in one of his accounts. Wilson then would have had to tell the jury that Gibbons had a reason not to transfer the $180,000 in his own account for fear of seizure. Accordingly, he had a reason to transfer the amount into a third party's account (that is, Wilson's).

Under what has come to be known as "reverse 404(b) evidence," a defendant can introduce evidence of someone else's conduct if it tends to negate the defendant's guilt. The trial court is entitled to exclude this kind of evidence if, upon a balancing of the evidence's probative value against considerations such as prejudice, undue waste of time, and confusion of the issues under Rules 401 and 403 of the Federal Rules of Evidence, it concludes that the evidence would not be beneficial. *United States v. Reed*, 259 F.3d 631, 634 (7th Cir. 2001). Such reverse 404(b) rulings, like other evidentiary rulings, are reviewed with deference. *United States v. Walton*, 217 F.3d 443, 450 (7th Cir. 2000). Because the evidence that Wilson wished to offer would not have played a major role in disproving his guilt, there is no basis for disturbing the trial court's

ruling on this matter. Its exclusion did not violate Wilson's Sixth Amendment right to present a defense.

## IV

For these reasons, we AFFIRM Wilson's conviction.

A true Copy:

       Teste:

 

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
