In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-3493

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SCOTT BOOKS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:16-cr-10037 — **Michael M. Mihm**, *Judge.*

ARGUED NOVEMBER 9, 2018 — DECIDED JANUARY 29, 2019

Before BAUER, BRENNAN, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* On trial for bank robbery, Scott Books chose not to testify in his own defense and was found guilty and sentenced to 180 months' imprisonment. He now challenges two pretrial decisions by the district court. The first allowed eyewitness testimony at trial from the two bank tellers that Books alleged based their identification of him as the robber not on personal knowledge, but rather on information improperly supplied by a police detective. The sec-

ond ruling would have allowed the government, had Books chosen to testify at trial, to impeach him with physical evidence directly tying him to the robbery—evidence the police learned of (and then recovered) only as a result of a confession the district court separately had determined was unlawfully coerced.

Neither challenge succeeds. The district court did not err in finding the eyewitness identifications reflected the tellers' firsthand knowledge of Books, and thus allowing their testimony at trial was entirely proper. Nor can we conclude that the district court's conditional impeachment ruling, even if wrong on the law, mandates reversal in light of the overwhelming weight of evidence against Books. So we affirm.

**I**

**A**

On July 28, 2016 a man robbed the Land of Lincoln Credit Union in Normal, Illinois. Dressed in a black hooded sweatshirt, wearing a mask and neon gloves, the robber approached the counter and, while motioning toward the drawer with what appeared to be a black handgun, demanded "all the money." The robbery lasted all but 20 seconds, with the offender making off with $18,000 and fleeing in a Buick SUV.

Two tellers recognized the robber's voice and mannerisms and immediately identified him as Scott Books—a longtime customer of the credit union. Holly Bateman told her supervisor (and later the police) she was 99% certain Books was the robber because she had interacted with him on at least six prior occasions. The second teller, Susan Phelps,

agreed with Bateman's identification of Books as the offender. A third witness, James Teidman, was driving by the bank when he saw the robber running from the bank with a gun, only then to speed away in a Buick SUV.

The police arrested Books the next day. After waiving his *Miranda* rights and agreeing to an interview, he confessed to the robbery, while also telling the police where they could find the gloves, clothing, and fake gun he used. The police found these items exactly where Books described, and in time a grand jury indicted Books for the robbery.

B

The district court held a series of pretrial hearings to determine the admissibility of evidence contested by Books. Three of those rulings are significant to this appeal.

*First*, the district court suppressed Books's confession, finding that the police officers overstepped and overcame Books's will by threatening to arrest his wife and take his children into custody if he did not own up to his role in the robbery—rendering the confession involuntary. The court suppressed both the confession and its physical fruits—specifically, the clothing, gloves, and fake gun the police recovered based upon Books telling them where to look.

*Second*, the district court denied Books's motion to prevent the two bank tellers (Bateman and Phelps) from testifying at trial. Books had sought to exclude their testimony on the basis that the police detective who investigated the robbery improperly tainted their identifications when, a day after the robbery, he allegedly told both witnesses that Books had confessed to the crime. The government disagreed, taking the position that the detective in no way revealed

Books's confession and thus in no way influenced the tellers' clear and definitive identification of Books as the robber. The district court held a hearing, received testimony from the tellers and detective, and found it "clear from th[e] record that [both tellers] have a truly independent source of identification of [Books] other than any suggestion that would have been put in their mind by the officer." Accordingly, the district court permitted the tellers to testify at trial.

*Third*, the district court considered but reserved definitively ruling until trial on the government's motion for permission to impeach Books with the fruits of his confession in the event he chose to testify. Books opposed the motion and urged the district court to hold that the price for the police unlawfully coercing his confession should be the suppression of all incriminating evidence (his admission and the physical fruits) for *all* purposes, including impeachment. The district court said it was inclined to allow some impeachment but reserved a final ruling unless and until Books chose to testify and the government sought to impeach him on cross-examination with his prior statements describing the whereabouts of the clothing he wore during the robbery. The district court cast its ruling this way: "[I]f and when we get to that point [of the trial], any questions that the government wished to ask the defendant if he testifies, I would have to hear exactly what the questions are outside the presence of the jury so there could be specific objections."

C

In the end, Books chose not to testify at trial, and thus neither his coerced confession nor the resulting physical fruits came into evidence. The government nonetheless presented a strong case, including testimony from these witnesses:

- Bank teller Holly Bateman identified Books as the robber. She testified that she knew Books from her work at the credit union and immediately recognized him as the robber—so much so that she almost said "Scott, can you remove your mask?" Bateman told the jury that she "instantly" recognized Books's voice and likewise knew it was Books from his distinct mannerisms. Asked at trial about her confidence level that Books committed the robbery, Bateman testified that she was 110% sure because the incident had replayed over and over in her mind.

- Susan Phelps, the second bank teller, also identified Books as the robber. While not as fast as Bateman to recognize Books during the robbery, Phelps testified she was confident Books was the offender based on his unique mannerisms, including his walk and jittery disposition.

- Phillip Meyer, a friend and former coworker of Books, testified that he had received a text message from Books on the day of the

robbery or the day before asking, "I wonder what bank I should rob today?"

- Todd Hogan, the bank's vice president, testified that he remembered teller Holly Bateman calling him immediately after the robbery to tell him she was 99% sure the robber was Books. Hogan also explained that Books's business account had been flagged in the bank's system on multiple occasions due to attempts to deposit checks backed by insufficient funds.

- James Teidman testified that he was driving by the credit union when the robbery occurred and saw a Buick SUV, the same model later tracked to Books's residence, flee the scene.

While Books chose not to testify, his counsel vigorously cross-examined the government's witnesses. When it came to tellers Bateman and Phelps, defense counsel challenged their recollection of the robbery, probed the reliability of their identifications of Books and the getaway car, and examined their memory of the robber's dress, voice, and mannerisms—all in an effort to question their overall confidence that Books was the offender. At no point during the trial did Books's counsel or the government refer to Books's confession or to the police detective's (allegedly impermissible) interaction with the two tellers. The jury returned a guilty verdict.

**II**

**A**

Books challenges the district court's pretrial ruling denying his motion to preclude the two tellers from testifying at trial on the basis that the police detective allegedly tainted their eyewitness identifications by telling them that he had confessed to the robbery. This misconduct, Books contends, violated his Fifth Amendment right against self-incrimination. He further argues that the district court's pretrial ruling too circumscribed his Sixth Amendment right to cross-examine the tellers at trial. The facts belie both contentions.

While all agree that our review of legal issues is *de novo*, the parties dispute the legal standard that governs the admission at trial of the bank tellers' identification testimony. Books invites us to follow *Kastigar v. United States*, and thereby place the burden on the government to show that the tellers' testimony was "derived from legitimate independent sources" and, as a result, not unduly influenced by the police detective. See 406 U.S. 441, 461–62 (1972). The government, on the other hand, urges us to read *Kastigar* as more narrowly applying to, and not beyond, the setting that gave rise to its holding—circumstances in which a witness testifies pursuant to a grant of immunity. See *id*. The government instead asks us to employ the less onerous, due-process based standard found in cases like *Neil v. Biggers*, 409 U.S. 188 (1972), where the focus is more simply on the reliability of in-court identification testimony with the defendant (not the government) bearing the initial burden of showing that the government did something to taint the identification. See also, *e.g.*, *United States v. L'Allier*, 838 F.2d

234, 239 (7th Cir. 1988) (explaining that the defendant bears the burden of showing that the challenged identification was unduly suggestive).

The proper reach and application of the *Kastigar* rule has not gone unnoticed by other courts. See, *e.g.*, *United States v. Allen*, 864 F.3d 63, 90 n.121 (2d Cir. 2017) ("[I]t is not clear whether all involuntary statements or all compelled statements should be subjected to the strong medicine prescribed in *Kastigar*, or whether some other doctrine should govern in certain circumstances."); *United States v. Jones*, 542 F.2d 186, 199 n.24 (4th Cir. 1976) (discussing uncertainty over *Kastigar*'s application to coerced confessions).

We have not had a case requiring us to choose sides, and this appeal does not either. We can comfortably resolve the case on narrower grounds, because under either *Kastigar* or *Biggers* (or hybrids of either standard), the evidence was more than sufficient to show that the two tellers, Bateman and Phelps, identified Books based on their prior dealings and first-hand familiarity with him, without regard to any information supplied by the police detective. At no point did the tellers, and most especially Holly Bateman, ever waiver in their confidence that Books was the robber. So, whether assessed under *Kastigar* or a lesser standard, Books's challenge to the district court's admission of the tellers' testimony cannot succeed.

Books fares no better when contending that the district court's ruling on the tellers' testimony also violated the Sixth Amendment by limiting his ability to confront and cross-examine these witnesses. A fulsome cross-examination, Books posits, would have entailed questioning how the wit-

nesses arrived at their identification testimony—a line of questioning, as Books sees it, that necessarily would have exposed that the police improperly told both tellers that he had confessed to the robbery. We cannot agree, as Books's position misfires on the law and facts.

A defendant's Sixth Amendment right to confront witnesses is not absolute, but instead subject to reasonable limitations imposed by the district court. See *United States v. Saunders*, 166 F.3d 907, 918 (7th Cir. 1999) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). The limitation Books challenges came from the district court's pretrial ruling suppressing his coerced confession. This ruling favored Books and, beyond precluding the government from using the confession as evidence, naturally limited how he would approach cross-examining government witnesses, for he rightly wanted to avoid the jury learning that he had confessed to the robbery. But accepting a necessary and proper limitation on cross-examination does not, without more, run afoul of the Confrontation Clause, especially where, as here, Books was able as a practical matter to adequately, and indeed vigorously, cross-examine both bank tellers. See *United States v. Sasson*, 62 F.3d 874, 882 (7th Cir. 1995) (explaining that the Confrontation Clause "guarantees only an opportunity for a thorough and effective cross-examination, 'not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish'") (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). And Books was able to do so without ever insinuating, much less revealing, that he had confessed to the robbery. The Confrontation Clause required no more.

B

This brings us to Books's Fifth Amendment challenge to the district court's pretrial impeachment ruling. Books argues that the ruling—allowing the government, if he chose to testify, to cross-examine him with the fruits of his coerced confession—created an unconstitutional predicament and catch-22: he was forced to either forfeit his right to testify in his own defense, or, if he did take the stand, face a surefire conviction once the government impeached him with the fruits of his confession.

Books may be right in his contention that the district court, even though reserving a final ruling until after seeing whether he chose to testify and what questions the government wanted to ask on cross-examination, committed legal error in concluding, however conditionally, that some impeachment with the physical fruits of a coerced confession may be permissible. While that proposition is not settled in the law, Books's position is not without some support. See, *e.g.*, *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion) (emphasizing, albeit in dicta, that "those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial").

The government urges us to avoid answering this question. Pointing to *Luce v. United States*, 469 U.S. 38 (1984), the government says that Books waived any challenge to the district court's ruling by not testifying at trial. The government's position finds substantial, if not dispositive, support in our decision in *United States v. Wilson*, 307 F.3d 596, 600–01 (7th Cir. 2002), where the defendant chose not to testify at

trial and, as a result, we declined to review the merits of his claim that a pretrial ruling on the admissibility of particular impeachment testimony violated his Fifth Amendment right to remain silent.

The whole point of the rule announced in *Luce*, which we extended to the domain of a Fifth Amendment claim in *Wilson*, is that courts should refrain from reviewing claims that a particular line of cross-examination would have violated a defendant's right against self-incrimination when the defendant in fact never testified at trial and thus never underwent cross-examination. Any other course, the reasoning runs, would require too much speculation on how the testimony and related questioning would have played out at trial. See *Wilson*, 307 F.3d at 600–01.

Even if we agreed with Books that *Wilson* should be read more narrowly, our ensuing reasoning would not travel a path that resulted in an award of relief. Both parties agree that the ultimate merits of Books's Fifth Amendment claim is subject to harmless error review. Indeed, the doctrine of harmless error finds straightforward application on the evidence presented at Books's trial.

Not every constitutional error automatically requires the reversal of a defendant's conviction. Instead, as the Supreme Court has explained, "if the government can show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained,' … then the error is deemed harmless and the defendant is not entitled to reversal." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). This precise standard would apply if Books had testified and was subjected to certain impermissible impeachment. See *Arizona v.*

*Fulminante*, 499 U.S. 279, 306 (1991) (holding that the doctrine of harmless error applies to the violation of the defendant's Fifth Amendment right against self-incrimination through the admission at trial of an involuntary confession). And the same analysis would apply if we accept Books's contention that the district court's ruling constructively foreclosed his decision to take the stand. See *Ortega v. O'Leary*, 843 F.2d 258, 262 (7th Cir. 1988) (applying harmless error analysis to the denial of the right to testify); *Alicea v. Ganon*, 675 F.2d 913, 925 (7th Cir. 1982) (reaching the same conclusion).

In reviewing the trial record, our obligation is to determine whether any error was harmless beyond a reasonable doubt, and we do so in no small part by evaluating the overall strength of the prosecution's case. See *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011). On this front, Books faces an insurmountable burden because the evidence against him at trial was overwhelming: the eyewitness testimony of the two bank tellers, the text message to a friend indicating his desire to rob a bank, the identification of his car as the getaway vehicle, and the testimony of over a dozen other witnesses—all in the broader context of his financial difficulties and prior disputes with the Land of Lincoln Credit Union. On this record, any error in the district court's pretrial ruling on the scope of permissible impeachment was harmless beyond a reasonable doubt.

## III

Two other matters warrant attention. First, relying on *Brooks v. Tennessee*, 406 U.S. 605 (1972), Books argues that the district court's impeachment ruling deprived him of the "guiding hand of counsel" by undermining his attorney's

ability to make informed and independent decisions about the best trial strategy, including whether Books should take the stand in his own defense. *Id.* at 612. But *Brooks* provides no refuge, for there the Supreme Court considered a state statute that required a defendant, if he chose to put on a defense at trial, to be the first defense witness to testify, forcing a preemptive decision to take the stand absent "a full survey of all the case." *Id.* at 608. Books, in contrast, faced only the uncertainty that often accompanies an unfavorable (and perhaps even incorrect) pretrial ruling on the scope of impeachment. Whatever limitations this may have imposed on the strategic choices of Books's defense, they were far afield from the extreme circumstances defense counsel confronted in *Brooks*.

Finally, we reject Books's invitation to overturn his conviction on the basis of cumulative error. We have reviewed the record carefully and cannot get anywhere near concluding that there are "multiple errors [that] so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001). The bottom line is that Books's cumulative error argument cannot overcome the overwhelming evidence presented against him at trial.

For these reasons, we AFFIRM.